# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| AMANDA M. LABRIER, individually, | ) | |
| and on behalf of all others similarly | ) | |
| situated, | ) | |
| | ) | No. 2:15-cv-04093-NKL |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Amanda LaBrier moves for class certification. Doc. 123. The motion is granted.

## I.    Background

LaBrier's house was damaged in a hail storm, a covered loss under her insurance policy issued by Defendant State Farm Fire and Casualty Company. LaBrier made a claim under the section of the policy that provided for an "actual cash value" (ACV) payment to be made to an insured before, and regardless of whether, the insured repaired or replaced the damaged property. The dispute in this case involves State Farm's practice of deducting labor depreciation when it calculates an ACV payment.

### A.    The form insurance policy and State Farm's calculation of ACV

State Farm adjusts structural damage insurance claims in accordance with the loss settlement provisions of the form policy issued to LaBrier and the putative class members. The policy generally provides for a "two-step loss settlement[:] a payment first of actual cash value ("ACV"), followed by the potential for an additional payment of replacement cost benefits of

amounts actually and necessarily spent."  Doc. 162-4, p. 3 (Exh. D, Affidavit of Juan Guevara,

State Farm Claim Consultant).  LaBrier holds such a policy, which provides, in part:

SECTION I – LOSS SETTLEMENT

Only the Loss Settlement provisions shown in the Declarations apply.  We will settle covered property losses according to the following[:]

COVERAGE  A – DWELLING

1.  Al – Replacement Cost Loss Settlement – Similar Construction

    a.  We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I – COVERAGES, COVER-AGE A – DWELLING, except  for wood fences, subject to the following:

        (1) until actual repair or replacement is completed, we will pay only the actual cash value  at  the  time  of  the  loss of  the  damaged  part  of  the  property,  up  to  the applicable limit of liability shown in the Declarations, not to  exceed the cost to repair or replace the damaged part of the property;

        (2) when the repair or replacement is actually completed, we will pay the covered additional amount  you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

        (3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged  part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed;

* * *

Doc. 21-1, p. 29.

    The  policy  contains  no  explanation  of  how  State  Farm  calculates  ACV,  nor  any

- 2 -

definitions of ACV or depreciation.  State Farm's practice is to calculate "an ACV payment …
by subtracting depreciation and the insured's deductible from the estimated replacement cost."
Doc. 160-4, p. 4.  State Farm uses software called "Xactimate" from Xactware Solutions, Inc.,
and used it throughout the class period to develop structural damage repair or replacement cost
estimates, calculate ACV payments for its insureds, and determine whether a contractor's
estimate of replacement cost is too high.  Doc. 162-2, Deposition of Daniel Gray[1], p. 22-23, and
49 (depo. pp. 78:14-79:17; 82:7-9; and 188:11-18). Gray could not recall a single instance, in ten
years of adjusting claims, when an estimate was prepared without using Xactimate, or when
Xactimate was not accurate.  *Id.*, p. 49 and 58 (p. 188:11-15, and p. 223:11-15).

More specifically, Xactware maintains State Farm's claims and estimating data, including
the data underlying the component parts of each line item in an estimate State Farm prepares.
Doc. 162-4, Affidavit of Juan Guevara[2], p. 8.  Xactimate applies Xactware's published unit
prices, "which are typically comprised of embedded material and labor components[.]"  *Id.*, p. 7.
For example, the square foot unit pricing for "R & R drywall," removal and replacement of
drywall, includes a material component—the drywall, and a labor component—removing the
existing drywall and putting up the new drywall.  *Id.*  State Farm set the software default to apply
depreciation "to all elements of the published unit cost" in general, but not to "stand-alone labor
charges."  *Id.*, and n.3. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[1]      Gray was the State Farm adjuster who handled LaBrier's claims.
[2]      Guevara is a State Farm Claim Consultant who has worked for State Farm for 33
years, and provided the declaration in support of State Farm's removal of this case from state
court.

████████████████████████████████████████ The amount of labor depreciation can be calculated to the penny.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ State Farm maintains records of claim payments it makes, in its internal Enterprise Claim System or ECS. While ECS contains data input from Xactimate, Xactimate does not, as a general rule, contain payment data. Part of the Xactimate application is a payment tracker that can track payments made on a particular claim. Some claims might have payment tracker information logged in Xactimate, but State Farm does not provide training to employees on that aspect of the software, nor routinely use it to track payments. Doc. 162-5, pp. 8 and 34-35 (depo. p. 25, lines 11-22, and pp. 129-130).

State Farm sent LaBrier an ACV payment, with an accompanying packet of material, including a description of "State Farm's Structural Damage Claim Policy"; a "Building Estimate Summary Guide" based on a sample estimate; an "Explanation of Building Replacement Cost Benefits" for LaBrier's "Homeowner Policy"; and a breakdown of the computation for work on LaBrier's house. Doc. 29-1; Doc. 162-4, pp. 3-4. The Building Estimate Summary Guide defined several terms, including:

> Replacement Cost Value (RCV) – Estimated cost to repair or replace damaged property.
>
> Net Actual Cash Value Payment (ACV) – The repair or replacement cost of the damaged part of the property less *depreciation* and *deductible*.
>
> Depreciation – The decrease in the value of property over a period of time due to wear, tear, condition, and obsolescence. A portion or all of this amount may be eligible for replacement cost benefits.

---

[3]      Jackson is a Claims Specialist who has worked for State Farm for over 25 years.

> Non Recoverable Depreciation – *Depreciation* applied to items that are not eligible for replacement cost benefits.
>
> Total Maximum Additional Amount if Incurred – Total amount of recoverable depreciation after actual repair or replacement of the property.
>
> Total Amount of Claim if Incurred – Total amount of the claim, including *net actual cash value payment and total maximum additional amount if incurred.*

Doc. 29-1, p. 3 (emphasis in original).

The Explanation of Building Replacement Cost Benefits LaBrier received more specifically explained her actual cash value payment, and how she could obtain replacement cost coverage:

> Your insurance policy provides replacement cost coverage for some or all of the loss or damage to your dwelling or structures. Replacement cost coverage pays the actual and necessary cost of repair or replacement, without a deduction  for depreciation, subject to your policy's limit of liability.  To receive replacement cost benefits you must:
>
> 1.     Complete the actual repair or replacement of the damaged part of the property within two years of the date of loss; and [sic]
>
> 2.     Notify us within 30 days after the work has been completed.  [sic]
>
> 3.     Confirm completion of repair or replacement, by submitting invoices, receipts or other documentation to your agent or claim office.
>
> Until these requirements have been satisfied, our payment(s) to you will be for the actual cash value of the damaged part of the property, which may include a deduction for depreciation.
>
> Without waiving the above requirements, we will consider paying replacement cost benefits prior to actual repair or replacement if we determine repair or replacement costs will be incurred because

repairs are substantially under way or you present a signed contract acceptable to us.

The estimate to repair or replace your damaged property is $8,088.07. The enclosed claim payment to you of $4,657.28 is for the actual cash value of the damaged property at the time of loss, less any deductible that may apply. We determined the actual cash value by deducting depreciation from the estimated repair or replacement cost. Our estimate details the depreciation applied to your loss. Based on our estimate, the additional amount available to you for replacement cost benefits (recoverable depreciation) ls $2,009.79.

If you cannot have the repairs completed for the repair/replacement cost estimated, please contact your claim representative& prior to beginning repairs.

All policy provisions apply to your claim.

*Id.* at p. 5.

As noted above, LaBrier's actual cash value payment of $4,657.28 reflected a subtraction of $2,009.79 for depreciation, and another subtraction for the deductible, from the estimate of the cost of repair or replacement. Agreeing that it was a "very simple process," State Farm's adjuster, Gray, testified he could figure out how much labor depreciation had been applied to LaBrier's ACV calculation by checking a box in Xactimate. Doc. 162-2, pp. 29 and 57 (depo. 105:18-106:23; and 218:23-219:1).

This case was originally filed in state court, and State Farm removed it within 30 days of service. The Guevara declaration in support of removal identified "approximately 15,000 Missouri structural damage claims" in which labor depreciation was withheld in 2012 alone. Doc. 1-5, ¶ 7. State Farm also produced the underlying Excel spreadsheet relied upon in the declaration. The spreadsheet identified 149,418 claim numbers, and for each claim stated the amount of labor depreciation stated in the Xactimate estimate, the ACV and Replacement Cost

- 6 -

(RC) amounts, cause of loss codes, payment amounts, payment dates, and payment coding, for the period 2005 to 2015, inclusive.

### B. The proposed class

LaBrier seeks certification of a class of State Farm property insurance policyholders in Missouri whose ACV payments were reduced by the withholding of labor depreciation since 2005, specifically:

> All State Farm Fire and Casualty Company ("State Farm") property insurance policyholders who submitted a claim for structural damage to a property in Missouri, and whose actual cash value ("ACV") payment was reduced by the withholding of labor depreciation, during the time period from March 30, 2005 to the date of trial, inclusive.

> This class includes policyholders who submitted claims for which the first ACV payment was made on or after March 30, 2005.

> This class includes any policyholder who received no payment from State Farm solely because the withholding of labor depreciation caused the value of the claim to drop below the applicable deductible.

> Excluded from the class is any policyholder who received the full limits of applicable coverage.

> Excluded from the class is any policyholder whose claim was the subject of an appraisal or individual lawsuit.

> Excluded from the class are the members of the judiciary and their staff to whom this action is assigned; State Farm and its affiliates, officers and directors; and plaintiff's counsel.

Doc. 123, p. 1.

## II. Discussion

### A. Class certification standard

Under Federal Rule of Civil Procedure 23, a motion for class certification involves a two-part analysis. First, under Rule 23(a), the proposed class must satisfy the requirements of

"numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC,* 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013). LaBrier asserts that the proposed class qualifies under Rule 23(b)(3).

It is LaBrier's burden to show the class should be certified. *See Luiken,* 705 F.3d at 372. This burden is met only if, "after a rigorous analysis," the Court is convinced the Rule 23 requirements are satisfied. *Comcast,* 133 S.Ct. at 1432 (quoting *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551–52 (2011)). In the Eighth Circuit, the rigorous analysis includes examining whether the proposed class "is adequately defined and clearly ascertainable." *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 996 (8th Cir. May 3, 2016) (citing *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 n.3 (8th Cir. 1972)). Rigorous analysis may further "entail some overlap with the merits of the plaintiff's underlying claim," because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal–Mart,* 131 S.Ct. at 2551–52 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982)).

District courts have broad discretion in deciding whether class certification is appropriate. *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski,* 678 F.3d 640, 645 (8th Cir. 2012) (citing *Rattray v. Woodbury Cnty, Iowa,* 614 F.3d 831, 835 (8th Cir. 2010)).

## B. State Farm's preliminary arguments

State Farm argues that ascertainability of class members is a stand-alone requirement, separate from those explicitly provided in Rule 23. *See* Doc. 161, pp. 19-20. In *Sandusky*, as mentioned above, the Eighth Circuit recently explained that whether the proposed class is clearly ascertainable is a question that must be answered as part of the rigorous analysis performed

- 8 -

under Rule 23. 821 F.3d at 996. However, the Eighth Circuit has not "outlined a requirement of ascertainability" or treated ascertainability "as a preliminary requirement." *Id.* "'It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.'" *Id.* (quoting *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972)). Therefore, State Farm's arguments concerning ascertainability will be addressed below in connection with Rule 23's explicit requirements, rather than as a stand-alone requirement.

State Farm also treats ascertainability as a two-pronged test, requiring a showing of class members' standing, and identification of class members in an "administratively feasible manner" using objective criteria. *See* Doc. 159, pp. 14-16. In *Sandusky,* the Eighth Circuit expressly acknowledged the circuits' divergent views of the meaning of ascertainability. The Eighth Circuit noted, for example, that the Third Circuit uses a "heightened test," requiring a plaintiff to show the class is defined with reference to objective criteria, and that there is "'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" 821 F.3d at 995 (citing *Byrd v. Aaron's Inc.,* 784 F.3d 154, 163 (3rd Cir. 2015)). The Eighth Circuit also observed that the Seventh Circuit took the opposite approach. *Id.* at 996. Rejecting the Third Circuit's test, the Seventh Circuit has held that Rule 23 neither "'mentions [n]or implies this heightened requirement under Rule 23(b)(3) …. The policy concerns motivating the heightened ascertainability requirements are better addressed by applying carefully the explicit requirements of Rule 23(a) and especially [Rule 23] (b)(3).'" *Id.* (citing *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 659 (7th Cir. 2015)).

The *Sandusky* court then proceeded to examine whether the class proposed there was

ascertainable according to objective criteria, and concluded it was. *Id.* at * 997-98.[4] It did not apply any heightened ascertainability standard as advocated by the defendant there. Nor did it examine, or even mention, factors of standing or administrative feasibility in connection with ascertainability, factors advocated by State Farm here as part of the ascertainability analysis. Accordingly, this Court will not use State Farm's two-pronged test in connection with consideration of ascertainability.[5]

### C. Rule 23(a)

#### 1. Numerosity

Rule 23(a)(1) requires that the class be sufficiently numerous such that joinder of all members would be impracticable. In assessing whether the numerosity requirement has been met, courts examine such factors as the number of persons in the proposed class, the nature of the action, the size of the individual claims, and the inconvenience of trying individual claims. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982). In removing this case from state court, State Farm itself identified many thousands of payments made to policy holders in which

---

[4]    *Sandusky* was a class action brought under the Telephone Consumer Protection Act, concerning the defendants' practice of sending facsimiles advertising their services, but failing to include opt-out notices. The TCPA prohibits sending an unsolicited fax advertisement to a recipient. The district court denied class certification on the basis that persons in the class could not be objectively established and the class was therefore not ascertainable.

The Eighth Circuit reversed. The court held that the best objective indicator of the recipient of a fax is the person who subscribes to the fax number. "True, the subscriber to the fax number may not be the recipient of the fax. However, fax logs showing the numbers that received each fax were objective criteria making recipients clearly ascertainable." *Sandusky,* 821 F.3d at 997 (citing, *inter alia, Chapman v. Wagener Equities, Inc.,* 747 F.3d 489, 492 (7th Cir. 2014) (affirming class certification in a TCPA class action involving over ten thousand persons and explaining that recipients "of faxes who don't have rights under the [TCPA] just wouldn't be entitled to share in the damages awarded to the class by a judgment or settlement"). Accordingly, the Eighth Circuit held the district court had abused its discretion in denying class certification. *Id.* at 998.

[5]    Nonetheless, adequacy of the class definition, ascertainability of class members according to objective criteria, and State Farm's standing arguments are addressed below as relevant factors to be considered in the context of Rule 23 generally.

labor depreciation was withheld during the relevant period. The size of the individual claims would make individual suits impracticable. Numerosity is satisfied here.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." A plaintiff must show that the claims "depend upon a common contention" that "is capable of class wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551. But commonality "'does not require that every question of law or fact be common to every member of the class ... and may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Downing v. Goldman Phipps PLLC*, 2015 WL 4255342, at *4 (E.D. Mo. July 14, 2015) (quoting *Paxton,* 688 F.2d at 561).

Commonality is satisfied here for at least two, independent reasons. One is the overarching, undisputed, and common fact of State Farm's practice of withholding payment from all its insureds for the depreciated labor component of mixed items of loss, from 2005 to 2015, using a software program that calculates depreciation the same way for each insured's claim. Additionally, a central legal question has already been resolved. On State Farm's motion to dismiss for failure to state a claim, this Court held that the terms "actual cash value" and "depreciation" as used in State Farm's policy are ambiguous and must be construed in favor of the insureds. Doc. 67, pp. 14-17 (Order, dated 11/30/2015).

Nonetheless, State Farm argues commonality is lacking because LaBrier sustained a loss due to hail; the Court's Order of 11/30/2015 differentiated between non-fire losses and fire losses; and the Court has not yet ruled whether the policy is ambiguous with respect to fire

losses. Thus, State Farm argues, LaBrier cannot demonstrate commonality between insureds who suffered non-fire losses, and those who suffered fire losses. LaBrier responds that because State Farm adjusted and paid non-fire losses the same as fire losses, State Farm is estopped from now asserting a different defense in relation to claims paid for fire losses. Doc. 188, pp. 26-27 (citing HON. DAVID D. NOCE, MISSOURI PRACTICE: INSURANCE LAW AND PRACTICE § 6:26 (2nd ed. 2009), and *Brown v. State Farm Mut. Auto. Ins. Co.,* 776 S.W.2d 384, 388-89 (Mo. banc 1989)).

It is true that State Farm followed the same labor depreciation practice to calculate ACV for both fire and non-fire claims. Thus, if estoppel applies, the commonality requirement will be satisfied for both fire and non-fire claims.[6] If estoppel does not apply, then a subclass for fire damage claims will likely be available because the legal issues raised by State Farm will be common to all fire damage claims. On this record, it is premature to resolve any of these issues, but it is clear that there are at a minimum common questions of fact that satisfy the commonality requirement at this stage. The commonality requirement does not require that every question of law or fact be common to every class member. *Paxton,* 688 F.2d at 561. Even a single, common question will do. *See Wal-Mart*, 131 S.Ct. at 2556.

State Farm also argues commonality and standing are lacking because the class as defined includes members who suffered no injury. Effectively, State Farm reasons that any putative class member who repaired her property and received a replacement cost payment, necessarily recovered any depreciated labor that was improperly deducted from the ACV payment. Because some class members made repairs and others didn't, State Farm argues commonality does not exist and those class members lack standing because they have no injury.

---

[6] The Court does not at this time rule on LaBrier's estoppel argument, which she makes for the first time in her reply suggestions.

The Court rejects this argument because, at a minimum, all members of the putative class share common legal issues, i.e., what is the meaning of ACV and can labor be depreciated. The issue of subsequent payment is not even relevant until these common issues are addressed. This is because payment is generally an affirmative defense, Fed. R. Civ. P. 8(c)(1), and an affirmative defense does not defeat Article III standing. *See Snider Int'l Corp. v. Town of Forest Heights*, 906 F.Supp.2d 413, 424 (D. Md. 2012), *aff'd sub nom. Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140 (4th Cir. 2014). At this stage in the proceedings, the Court's inquiry is "limited to determining whether … common evidence could suffice to make out a prima facie case for the class[.]" *Luiken*, 705 F.3d at 377 (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011)). *See also Blades*, 400 F.3d at 566-67 (same). Under the proposed class definition and based on the evidence before the Court, LaBrier has made out a prima facie case for the class based on issues common to the class – State Farm deducted labor depreciation from each class member's ACV payment which is not permitted by the terms of the policy and the class members were injured in the amount of the depreciated labor. This is all that is required for purposes of class certification. *See Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778-79 (8th Cir. 2013) (internal quotations and citations omitted).

Finally, as discussed in the section on predominance, "[i]ndividualized damage calculations … and …affirmative defenses rarely defeat a finding of predominance." WM. B. Rubenstein, Newberg on Class Actions §4:53 (5th ed., updated June 2016).

State Farm's authority concerning standing, Doc. 161, p. 20, does not change the above analysis. In *Indigo LR LLC v. Advanced Ins. Brokerage of Am. Inc.*, 717 F.3d 630 (8th Cir. 2013), the named plaintiff sued his insurer for failure to pay his medical bill. The Eighth Circuit agreed with the district court that once the medical bill was paid during the course of the

- 13 -

litigation, the plaintiff no longer had standing and the suit was properly dismissed. *Indigo* involved neither affirmative defenses, nor the class definition. Nor does the other case State Farm cites, *Walls v. Sagamore Ins. Co.*, 2009 WL 890528 (W.D. Ark. 2009), involve affirmative defenses.

### 3.    Typicality

The typicality requirement is met when the claims or defenses of the representative party are typical of those of the class. Rule 23(a)(3). The requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995). In determining typicality, courts consider whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996).

Like the other members of the proposed class, LaBrier had labor depreciation withheld from her ACV payment and seeks to recover it. State Farm witnesses admitted LaBrier's claim was not "unusual in any fashion" and was a "pretty standard hail-type claim." Doc. 132, pp. 5-6 (and citations therein). Whether some class members suffered fire losses, in contrast to LaBrier's non-fire or hail loss, is not a sufficient distinction to defeat typicality on the current record. All insureds had labor depreciation withheld from mixed-cost items, and LaBrier seeks to recover such withholdings. In other words, the claim arises from the same event or course of conduct as the class claims, and LaBrier's legal theory and goals are the same for herself and all class members. *See also In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063-64 (8th Cir. 2013) (rejecting argument that class representatives' claims were not typical when they omitted a cause of action available under California law; class

- 14 -

representatives shared a common goal of recovering costs for a defective product and there was no showing that the state law claim would allow for any legal remedy not already sought by the class representatives).  LaBrier is typical of the class for purposes of being a representative party.

Citing no authority, State Farm argues that LaBrier is not typical because she is subject to a unique affirmative defense, a duty to mitigate.   Specifically, State Farm argues that although LaBrier claims to have been damaged by State Farm's failure to pay $1,061.02 in withheld labor depreciation, she in fact partially repaired her property, but chose not to attempt to recover any of the $2,009.79 in replacement cost benefits available to her.   The argument is without merit. "Although the existence of unique defenses against a named plaintiff can defeat typicality, this generally is true only if the defenses 'threaten to become the focus of the litigation.'"  *In re TJX Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389, 394 (D. Mass. 2007) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2nd Cir. 1990)).  Courts are generally "reluctant to deny class action status ... simply because affirmative defenses may be available against individual members."   *Id.* (internal quotation and citation omitted).  Here, a duty to mitigate defense will not become the focus of the litigation, because such duty does not override a contract term requiring or promising payment.  *CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, 808 F.3d 747, 754 (8th Cir. 2015); *Burst v. R.W. Beal & Co., Inc.*, 771 S.W.2d 87, 89-91 (Mo. Ct. App. 1989); and 22 AM. JUR.2D DAMAGES § 362 (May 2016) ("An obligation to minimize avoidable consequences does not exist if the plaintiff has a vested contract right to recover the amount sought.").  The policy requires State Farm "to pay … the actual cash value at the time of the loss."   Doc. 21-1, p. 29.   The policy does not require the insured to replace or repair the damaged property, nor to seek supplemental payment.  Therefore, LaBrier is not uniquely subject to an affirmative defense of duty to mitigate, and such defense

- 15 -

will not become the focus of the litigation.

State Farm also argues LaBrier is not typical because some class members "were able to complete their repairs without need to seek any replacement cost benefits[.]" Doc. 161, p. 22. But typicality does not require a class representative to have claims and defenses identical to all other class members. The question is whether they are reasonably coextensive, *D.G. e. rel Strickland v. Devaughn,* 594 F3d 1188 (10th Cir. 2010), such that distinctions will not overshadow the common issues, *see*, CHARLES ALAN WRIGHT, ET AL., 7A FED. PRAC. & PROC. CIV. § 1764 (3rd ed.). As discussed below in the section on predominance, State Farm has not shown that a class action is inappropriate because of the possibility that some class members could make full repairs with their ACV payment.

Typicality is established.

### 4. Adequacy

Rule 23(a)(4) requires that the class representative and class counsel will "fairly and adequately protect the interests of the class." The adequacy requirement is met where: "1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and 2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Carpe v. Aquila, Inc.,* 224 F.R.D. 454, 458 (W.D. Mo. 2004) (internal quotes omitted). The requirement of adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997).

LaBrier seeks the same relief on her own behalf and on behalf of the class—repayment of withheld labor depreciation, plus pre-judgment interest. Furthermore, the proposed class counsel has experience prosecuting class actions, and insurance lawsuits in general and labor

- 16 -

depreciation lawsuits in specific. These counsel have previously been found to be adequate class counsel in numerous federal and state class action lawsuits.

State Farm argues LaBrier cannot be an adequate class representative for a number of reasons. State Farm argues LaBrier cannot represent insureds who suffered fire losses. This argument fails for the same reasons discussed above in connection with typicality and commonality. Moreover, the proposed class is not the sort of class that will result in winners and losers. *See Duchardt v. Midland Nat. Life Ins. Co.,* 265 F.R.D. 436, 449-50 (S.D. Iowa 2009) (finding that the proposed named plaintiffs would be inadequate class representatives where the remedies they sought would fail to benefit up to half of the class members, while benefitting the others). Her claim is not antagonistic to the claims of insureds with fire losses. LaBrier has also argued that estoppel precludes State Farm from changing its uniform method for adjusting both fire and non-fire claims.

State Farm also argues that LaBrier is not in the same position as those class members whose ACV payments actually represented the full cost of their repairs. Yet, even if there is some difference, the potential differences create no adversity and as discussed below, State Farm has not presented credible evidence that this purported affirmative defense will be a substantial factor in the litigation.

State Farm additionally argues LaBrier is not in the same position as those class members who would have received an ACV payment had labor depreciation not dropped their claims to an amount below their deductibles. As State Farm points out, the putative class LaBrier described in her Complaint consists of persons who did receive at least some ACV payment, but not, expressly, those whose ACV calculations were performed the same way but received no payment

- 17 -

at all because the amount State Farm calculated fell below their deductibles.[7]  State Farm admits

LaBrier could have alleged such a claim on her own behalf, because she had a second property

damaged by the same hail storm and did not receive payment for it when the calculated ACV fell

below her deductible.  Doc. 161, p. 11 n.10, and p. 23.  LaBrier responds by asking that the class,

as defined in her motion to expressly include persons whose ACV calculations were zeroed out

after application of their deductibles, be certified so as to avoid having to file a second suit and

revisiting the same issues there.  Doc. 188, p. 28 n.15.

   "A court is not bound by the class definition proposed in the complaint," *Smith v. Brown*

*& Williamson Tobacco Corp.*, 174 F.R.D. 90, 92 n.2 (W.D. Mo. 1997) (citation omitted), and

"has the authority to redefine a proposed class in such a way as to allow the class action to be

maintained," *In re Zurn Pex Plumbing Prods. Liability Litig.*, 267 F.R.D. 549, 558 (D. Minn.

2010).  In view of that flexibility, LaBrier argues, "holding [her] to the plain language of" the

definition in the Complaint would be "overly formalistic" and "would ignore the ongoing

refinement and give and-take inherent in class action litigation, particularly in the formation of a

workable class definition."  Doc. 188, p. 29 (citing *In re Monumental Life Ins. Co.*, 365 F.3d 408,

414 (5th Cir. 2004)).  LaBrier's argument is persuasive.  The change to the definition in no way

works a fundamental change to the issues and recovery sought.  There is no dispute that LaBrier

had a second property damage claim that falls within the expanded definition.  If LaBrier filed a

_____

[7]         Specifically, LaBrier pleaded that she sought to represent:

> [A] class consisting of all persons and entities insured under a
> State Farm homeowners policy who received a so-called Actual
> Cash Value payment from State Farm for physical loss or damage
> to their residence or to other structures in Missouri in which the
> cost of labor was depreciated  in calculating the payment for the
> period from March 30, 2005 to the date of trial.

Doc. 1-1, p. 20, ¶26.

separate suit to cover that second claim, the suit would plainly and needlessly duplicate much of the work that has already been performed in this case, and the point of class litigation is to lessen the burden on the parties and the courts. State Farm's opposition to the change is general and brief. Moreover, the affidavit State Farm filed in support of removal made no distinction between claims for which labor depreciation dropped an ACV calculation below the deductible, and those for which it did not. Expanding the definition is fair and serves judicial economy, and State Farm will not be prejudiced by it.

Finally, State Farm argues LaBrier made an admission that shows she is not an adequate class representative. Specifically, State Farm argues LaBrier "admitted" in deposition "that she is only complaining here regarding her claim" based on her first property, and it is too late for her to move to amend the complaint. Doc. 161, p. 23. The Court has reviewed the deposition testimony cited by State Farm and concludes LaBrier was simply describing what she understood to be pleaded in her complaint at present, not that she was disavowing any desire to recover withheld labor depreciation on her own behalf with respect to the second property, or on behalf of other persons whose ACV calculations were similarly zeroed out after application of their deductibles. Also, in her motion to certify, LaBrier asks to represent such class members, in lieu of filing a separate lawsuit. The cited testimony does not change the Court's conclusion.

Adequacy is demonstrated.

**D.      Rule 23(b)(3)**

To certify the class, LaBrier must further prove she meets the requirements of Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

- 19 -

### 1. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. In other words, it "'goes to the efficiency of a class action as an alternative to individual suits.'" *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. May 20, 2016) (quoting *Parko v. Shell Oil, Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014)). The requirement is not satisfied if "individual questions ... overwhelm the questions common to the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1196 (2013). The Eighth Circuit articulates the test as follows:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class. While limited in scope, this analysis should also be rigorous.

*Luiken, LLC*, 705 F.3d at 377 (8th Cir. 2013) (internal quotation and citation omitted). *See also Blades v. Monsanto Co.,* 400 F.3d 562, 566-67 (8th Cir. 2005) (same). For the reasons discussed below, the Court concludes common questions predominate.

The elements of a claim for breach of contract are:

> 1) the existence and terms of a contract; 2) the plaintiff's performance or tender of performance pursuant to the contract; 3) the defendant's breach of the contract; and 4) damages suffered by the plaintiff.

*Truman Bank v. New Hampshire Ins. Co.*, 370 S.W.3d 675, 676 (Mo. Ct. App. 2012) (citing *Keveney v. Mo. Military Acad.,* 304 S.W.3d 98, 104 (Mo. 2010) (en banc)). At a minimum, LaBrier has presented facts and law that establish a prima facie claim for breach of contract for herself and the class. The elements of that prima facie claim are the same for each class member. State Farm's form contract is applicable to each of them and the theory of breach is the same for

- 20 -

each class member – State Farm wrongfully deducted labor depreciation from each ACV payment. The record shows that State Farm used the same method for calculating the ACV payment for each member of the class regardless of the type of casualty suffered or any other factor.

State Farm has identified four primary reason why common issues are allegedly overwhelmed by individual issues. Throughout its brief, State Farm argues that class certification is not proper because (1) the members of the class cannot be identified without individual inquiry, (2) the law applicable to fire claims is not the same as the law applicable to all other claims, (3) some members of the class have suffered no injury because their ACV payment was sufficient to make full repairs, and (4) some members of the class were already paid any wrongfully withheld labor depreciation when State Farm gave them a full replacement value payment after repairs were completed. State Farm argues that for these reasons the class cannot be objectively ascertained, some members of the class lack standing, and these individual issues overwhelm common questions of fact or law, making a class action unmanageable.

In support of its argument, State Farm has included expert opinions. For example, Dr. Prowse opines on the meaning of State Farm's form contract. The Court does not find the opinion relevant because the interpretation of a contract is a question of law. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.,* 346 F.3d 1160, 1164 (8th Cir. 2003) ("The construction of an insurance policy—the process of determining its legal effect—is a question of law for the court[,] not a specialist or expert.").

State Farm also argues that it is not feasible to identify the members of the class without a file-by-file analysis of its records and such analysis will require a great deal of its time and resources. However, where an insurance company's records contain the objective information

necessary to identify class members or determine damages, courts routinely conclude class

certification is appropriate, notwithstanding the company's objection that researching its own

files is laborious or burdensome. *See, e.g., Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525-

26 (6th Cir. 2015) (finding class ascertainable where it "can be discerned with reasonable

accuracy using Defendants' electronic records … , though the process may require additional,

even substantial, review of files") (emphasis in original), *cert. denied,* 136 S. Ct. 1493 (2016); *In

re Monumental Life Ins. Co.*, 365 F.3d 408, 419 (5th Cir. 2004) (certifying class despite fact that

"thousands of grids must be constructed for the myriad of policy variations" where "defendants'

records contain the information necessary to determine [damages]"); *Perez v. First Am. Title Ins.

Co.*, 2009 WL 2486003, at *7 (D. Ariz. Aug. 12, 2009) ("Even if it takes a substantial amount of

time to review files and determine [who is in the class], that work can be done during

discovery."); and *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 560 (D. Md.

2006) ("Although the task [of compiling claims data for each class member] may prove to be a

laborious one, this court is not persuaded that it is one that cannot be reasonably managed.").

This approach squares with a basic reason why class actions are permitted at all:

> It is often the case that class action litigation grows out of systemic
> failures of administration, policy application, or records
> management that result in small monetary losses to large numbers
> of people.  To allow that same systemic failure to defeat class
> certification would undermine the very purpose of class action
> remedies.

*Rikos*, 799 F.3d at 525-26 (citation omitted).

Here, the records at State Farm's disposal concerning ACV calculations and payments

consist of data electronically generated or maintained by State Farm in its own database or the

database of its contractor, Xactware, using the Xactimate software.  State Farm used Xactimate

to develop structural damage estimates during the entire class period, and relied on Xactimate to

- 22 -

accurately calculate ACV payments for its policyholders. In preparing a declaration in support of removal, within 30 days of service of LaBrier's lawsuit, State Farm prepared an Excel spreadsheet identifying almost 150,000 claim numbers, and setting out for each claim the amount of labor depreciation stated in the Xactimate estimate, the ACV and replacement cost amounts, the cause of loss codes, payment amounts, payment dates, and payment coding, for the period 2005 through 2015. █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ LaBrier also supports her motion with the testimony the State Farm adjuster, Gray, who adjusted LaBrier's claim and could not recall ever adjusting a claim without an Xactimate estimate, or any instance in which Xactimate was inaccurate. The foregoing supports that the data is objective and the relevant calculation is formula-driven. Logically, a primary reason any large and sophisticated business entity such as State Farm would choose to maintain records electronically is to simplify the tracking and manipulation of such large amounts of data. In view of the foregoing, the Court sees no reason to depart from the above-mentioned line of cases in which courts have certified a class, where an insurance company's records contain the objective information necessary to determine damages.[8]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[8] Part of the Xactimate application is a payment tracker that can track payments made on a particular claim. The payment tracker feature is functional, but State Farm does not routinely use it or train employees to use it. Whatever State Farm's reason for not using a feature of the software it licenses and pays for, State Farm's failure to take advantage of it is not a reason to deny class certification. *See Rikos*, 799 F.3d at 525-26.



This conclusion is reinforced by other evidence State Farm submitted, the declaration of Alan King, a State Farm Claim Team Manager.  King explained that in January 2016, he "was asked to coordinate the review of certain Missouri structural damage claims for potential issuance of supplemental claim payments. The claims to be reviewed were those for which an Xactimate repair estimate had been prepared between November 30, 2015 and December 19, 2015 where the estimate reflected that depreciation had been applied to repair tasks with unit pricing that included a labor component."  Doc. 162-13, p. 2.   After "the claim numbers for the claims to be reviewed were placed into a database tool[,]" King instructed 29 claim representatives, who were assisting with the review, to review the files and do the following:

- Obtain a claim number from the database containing the claim numbers for the files to be reviewed.

- Open the selected claim through the ECS system.

- Review the claim record to determine the tasks, if any, for which replacement cost benefits had been paid. As a part of prior claim handling, the estimate for the file should already have been updated to reflect the items paid on a replacement cost basis, so that depreciation no longer would be reflected on the estimate for those tasks.

- Identify any tasks for which the insured indicated repairs had been completed at a cost equal to or below the actual cash value for the task. As a part of prior claim handling, the estimate should already have been updated to reflect that any prior depreciation calculated for those tasks was "non-recoverable," or to otherwise remove depreciation from the estimate for those tasks.

- Using the latest, most updated estimate, identify the total actual cash value as originally calculated. Then, re-run the estimate without application of depreciation to labor costs and determine the difference between the two calculated values to determine the amount of a supplemental payment, if any.

- Issue a supplemental actual cash value payment in that amount for the loss.

*Id.*, p. 3. King explained that if full repair had been completed, and any replacement cost benefits owed had already been issued, no supplemental payments would be made to the insured. *Id.* If partial repairs had been completed, and benefits for those repairs had been issued, then no supplemental payments were to be issued. The only supplementation provided was for remaining repairs still settled on an ACV basis, and to which some depreciation had been applied in the estimate. *Id.*, p. 4. King's declaration demonstrates that the process of identifying claims for which labor depreciation was withheld is a relatively straightforward one, and within the ability of State Farm's employees to readily perform based on the data and software it has or to which it has access. King's declaration further supports that the class is ascertainable using objective criteria.

State Farm complains that LaBrier has not submitted evidence to show that the process of class identification is feasible, but State Farm has refused to provide the discovery requested by LaBrier to identify the class members. Also, State Farm vigorously opposed permitting LaBrier access to its databases to obtain the information she sought to support her claims. Instead, State Farm sought to control access to its databases and data, and has provided information to the

- 25 -

extent it is useful to State Farm and at such time as State Farm saw fit. Yet it has refused to provide information routinely shared in discovery. It makes little sense to give much weight to State Farm's argument that the burden of identification is overwhelming when State Farm has not permitted any objective access to its data base to verify the facts alleged by State Farm here. State Farm has not even fully answered LaBrier's interrogatories pursuant to the Special Master's order, which this Court affirmed over State Farm's motion to vacate, yet State Farm was able to compile information about 150,000 claims within 30 days of having been served, in order to support its removal of this case from state court. Like other courts faced with similar arguments by insurance companies resisting class certification, this Court finds that "[it] strains credulity to suggest … [State Farm] lack[s] the ability to compile information on insurance policies … [it] issued[.]" *Lewis v. First Am. Title Ins. Co.,* 265 F.R.D. 536, 547 (D. Idaho 2010) (citing *Mitchell-Tracey v. United Gen. Title Ins. Co.,* 237 F.R.D. 551, 560 (D. Md. 2006)).

As for fire damage claims, the Court can create subclasses if it is determined that a different legal standard applies. This issue could then be more efficiently addressed in a dispositive motion that will be applicable to all fire damage claims. If State Farm is correct, this is the quickest and most efficient way to resolve all those claims.

As for class members who received replacement value payments after making repairs, the Court rejects State Farm's argument that it is too arduous to identify who falls in this category. It defies common business sense that State Farm cannot identify which customers received a replacement payment after receiving an ACV payment. State Farm has not rebutted that common sense conclusion by identifying a sufficient number of class members who fall in this category to justify even a plausible argument that this issue is likely to overshadow the common issues in dispute. Furthermore, even if some class members are ultimately shown to have no damages,

class certification is not defeated. There are procedural mechanisms to exclude them once the evidence is established. Again, this is an issue for summary judgment which if State Farm is correct will resolve this issue at one time which will promote efficiency, by finally addressing the issue in one stroke.

The fourth global issue raised by State Farm concerns putative class members who purportedly completed repairs at a cost equal to or below the ACV payment they received. Doc. 159, p. 22. State Farm reasons that its policy does not permit the ACV payment to be more than the cost of repair and replacement. Therefore, to determine whether a class member has been injured, State Farm argues it must start the claims adjustment process all over and determine anew for each class member whether the ACV payment is greater than the cost for repair or replacement. According to State Farm, this individualized inquiry will overwhelm any common issues.

As a practical matter, the Court finds this argument at best theoretical, because the only way State Farm can succeed on this defense is to show its own repair and replacement cost figures were wrong. For each class member, State Farm prepared an estimate of the cost to repair or replace the damaged property using Xactimate. It then deducted labor depreciation from that figure. By definition, State Farm's own repair and replacement cost figure cannot be greater than the labor depreciation damages that Labrier seeks. However, State Farm now argues that because it only estimated the cost of repair and replacement which it sent to its customer during the claims process, it must redo the calculation to make sure its own figures were not wrong. Yet, its own agent testified that he was unaware of any "Xactimate" calculation that ever underestimated the cost to repair and replace. Importantly, State Farm has not presented objective evidence that its practice of using Xactimate resulted in it regularly underestimating the

cost to repair and replace, in such large numbers that every claim must be re-reviewed and subjected to a new and different claims process. In the absence of such objective evidence about actual claims, the Court is unconvinced that Sate Farm has adopted a multiple-year business practice that underestimates the cost of repair and replacement, leading to routine uncertainty about the value of claims paid. In addition, there is some question about whether Missouri law would permit it to redo its calculations years after payment. To the extent this defense does apply, individual mini-trials can be held to resolve the dispute should State Farm decide to pursue this defense against its customers. The Court's experience is that litigants quickly tire of these mini-trials once a clear trend is established.

Finally, "courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses." *Smilow v. Southwestern Bell Mobile Syst.,* 323 F.3d 32, 39 (1st Cir. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 138–40 (2nd Cir. 2001), and *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 924 (3rd Cir. 1992)); *see also Eastwood v. So. Farm Bureau Cas. Ins. Co.,* 291 F.R.D. 273, 286 (W.D. Ark. 2013) (same). In fact, "individualized damage calculations … and affirmative defenses … rarely defeat a finding of predominance." WM. B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:53 (5th ed., updated June 2016). "If, moreover, evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms." *Smilow,* 323 F.3d at 40 (citations omitted).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████  Furthermore, it is inconsistent with the policy, which provides that an insured is entitled to a preliminary payment of ACV, regardless of whether the insured subsequently pursues repair or replacement. Also, as discussed above, the Court has concluded LaBrier has made a prima facie case for the class claims, which is all that she is required to do at this stage.

Moreover, many of the cases State Farm cites where courts found predominance lacking, involved damage claims based on a reasonableness or other subjective standard[9], in contrast to the objective standard at issue here. The other cases are readily distinguishable as requiring highly individualized inquiries into class membership and liability[10], in contrast to the case here.

---

[9]  *See Halvorson*, 718 F.3d at 779-80 (whether payments to insureds were "reasonable," as required by the policy); *Schafer v. State Farm Fire & Cas. Co.*, 2009 WL 2391238, at *1 (E.D. La. Aug. 3, 2009) (whether carrier failed to pay "reasonable" amounts due); *Mills v. Foremost Ins. Co.,* 269 F.R.D. 663 (M.D. Fla. 2010) (involving claims for non-payment of general contractor's "overhead and profit," which is only payable under the insurer's claim procedures when the a general contractor is "reasonably likely to be needed" in repair or replacement of the insured's loss; also involving numerous unique affirmative defenses requiring individualized inquiry); and *Nguyen v. St. Paul Travelers Ins. Co.,* 2008 WL 4691685, at *6 (E.D. La. Oct. 22, 2008) (same).

[10]  *See Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010) (proof of each class member's intent, and of information given to each class member, would have been required); *Kennedy v. United Am. Ins. Co.,*2013 WL 1367131 (E.D. Ark. Apr. 3, 2015) (class members could not be identified without individual inquiries; cohesiveness lacking because of choice of law issues; and class members were uniquely susceptible to affirmative defenses such as waiver and estoppel that would require consideration of individual proof); *Littleton v. State Farm Mut. Auto Ins. Co.,* 2015 WL 128577 (W.D. Mo. Jan. 8, 2015) (composition of class was not readily ascertainable through an objective search of insurer's records, and there were fact-intensive and individualized questions as to whether class members were injured by the insurer's practices); *Kraetsch v. United Serv. Auto Assn.*, 2015 WL 1457105 (E.D. Mo. Mar. 30, 2015) (liability determinations would have involved multiple inquiries with respect to every class member); *In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig.*, 276 F.R.D. 336, 346 (W.D. Mo. 2011) (in addition to lack of common governing law among class members, numerous individual factual issues existed, including whether, when, and why each class member stopped using Defendants' products; the extent of each class members' knowledge about BPA at the time of the purchase; and issues relating to damages); *Kennedy v. United American Ins. Co.,* 2013 WL 1367131, * 5 (E.D. Ark. Apr. 3, 2013) (manual review of hospital treatment records would be required to determine liability under the policy); and *True v. Conagra Foods, Inc.,* 2011 WL 176037, at *4 (W.D. Mo. Jan. 4, 2011) (the damages sought—bodily injury resulting in pain and suffering, mental anguish, loss of capacity for the enjoyment of life, loss of

- 29 -

State Farm's supplemental citation of *Ebert v. General Mills*, Doc. 186, does not change the analysis. In *Ebert*, the Eighth Circuit held that individual issues would predominate with respect to liability and damages, inasmuch as intensive, multi-pronged inquiries would be required into the causal relationship between the actions of the defendant and each class members' injuries. 823 F.3d at 479.[11] Here, the causal relationship between State Farm's liability and damages is straightforward.

"[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations and a recent dissenting decision of four Supreme Court Justices characterized the point as 'well-nigh universal.'" WM. RUBENSTEIN, NEWBERG ON CLASS ACTIONS, § 4:54 (Winter 2013 Supp.) (citing *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1437 (2013) (Ginsberg and Breyer, JJ., joined by Sotomayor and Kagan, JJ, dissenting)). *See also Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996) (noting that "[t]he fact that damage calculations might differ slightly [between plaintiffs] is a minor matter in comparison with [the] fundamental similarities" of the plaintiff's and class members' claims challenging defendant's course of conduct). Faced with such an issue, the Seventh Circuit held, more generally:

> It would drive a stake through the heart of the class action device,
> in cases in which damages were sought rather than an injunction or

---

earnings, medical expenses, and other economic damages—would require class members to present evidence of their individual losses, and the reasonableness of such losses would be subject to dispute).

[11] *Ebert* was an environmental contamination lawsuit, involving General Mills' alleged release of a dangerous chemical vapor into the environment of a residential neighborhood. The chemical was in the groundwater, soil, and air. The court explained that to resolve liability, numerous individual inquiries were necessary, such as a property-by-property determination of whether there was any vapor contamination, or threat of contamination, attributable to General Mills, and other issues such as whether there were other sources of contamination, or unique features of the property that created the potential for vapor intrusion. 823 F.3d at 479.

- 30 -

a declaratory judgment, to require every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortuous harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Butler v. Sears, Roebuck and Co.,* 727 F.3d 796, 801 (7th Cir. 2013). Likewise, in drafting Rule 23, the Advisory Committee stated that individual damage calculations should not scuttle class certification under Rule 23(b)(3). 39 F.R.D. 69, 102–103 (1966). *See also Byrd v. Aaron's, Inc.*, 784 F.3d 154, 171 (3rd Cir. 2015) ("We are not alone in concluding that 'the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification.' To hold otherwise would seriously undermine the purpose of … Rule 23(b)(3)[.]").

Here, the breach of contract claim is susceptible to class adjudication because it is based on the predominant, common question of whether State Farm—under the form contract language and pursuant to its common practice—may withhold labor depreciation from ACV payments under Missouri law. The common injury sustained is the amount of depreciation wrongfully withheld. These overarching issues, common to the claim of every putative class member, predominate and make class certification particularly appropriate. *See In re Checking Account Overdraft Litig.,* 286 F.R.D. 645, 656 (S.D. Fla. 2012) (where standardized "corporate policies constitute the very heart of the plaintiffs'… claims, … common issues will predominate because those policies would necessarily have to be reproven by every plaintiff") (quotation and citation omitted). *See also* 1 MCLAUGHLIN ON CLASS ACTIONS § 5:56 (12th ed., updated Dec. 2015) ("Breach of contract claims arising out of a standardized, form contract ordinarily are suitable for

- 31 -

class certification unless numerous inquiries are required to determine whether a breach of the contract occurred as to each class member.")

Additionally, throughout the class period, State Farm used Xactimate computer software to apply a formula to calculate labor depreciation and ACV payments. The putative class members' damages are data driven and can be mechanically calculated. *See, e.g., Perrin v. Papa John's Int'l, Inc.*, No. 09-01335, 2013 WL 6885334, at *7-8 (E.D. Mo. Dec. 31, 2013) (certifying class where damages could be determined through computer data); *Glen v. Fairway Indep. Mortg. Corp.*, 265 F.R.D. 474, 481-82 & n. 5 (E.D. Mo. 2010) (certifying class where individualized damages could be calculated "using computer records and clerical assistance").

Thus, in addition to a common legal question concerning liability, significant common facts and proofs drive both liability and damages.

### 2. Superiority

The final requirement of Rule 23(b)(3) is that the class action form be superior to other methods of adjudication, an analysis that "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164 (1974). In determining whether superiority is met, a court considers:

> A.    the interest of members of the Class in individually controlling the prosecution of separate actions;
> B.    the extent and nature of any litigation concerning this controversy already commenced by potential Class members;
> C.    the desirability of concentrating the litigation of the claims in this particular forum; and
> D.    the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3).

With respect to the first factor, LaBrier is the only persons to have come forward seeking to act as lead plaintiff in a class action on behalf of Missouri insureds concerning this claim. She has retained counsel with considerable experience in the prosecution of class actions and labor depreciation lawsuits. Many thousands of insureds would have to bring claims individually if a class is not certified. Under the circumstances, and given the predominance of common questions, the alternatives to class litigation are more burdensome for individuals than participating in class litigation. Class action is the most efficient way to resolve the common questions of law and fact.

As for the second factor, there is no evidence of another case concerning these same claims, that a Missouri insured has already brought, or a Missouri insured could join.

The third factor, the desirability of concentrating the litigation of the claims in this particular forum, favors certification. The class members are Missourians, this division is centrally located in the state, and as noted above, no other litigation concerning this identical claim has been commenced elsewhere.

Last, LaBrier's counsel, who has substantial experience in class action litigation, does not anticipate any significant or unusual difficulties in the management of this case as a class action. Indeed, resolution of State Farm's motion to dismiss has narrowed the liability issues, and the appointment of the Special Master for discovery, to which the parties agreed, is streamlining that aspect of the case. Furthermore, manageability "should be considered only in relation to alternative means of adjudication and thus should not be used to deny certification in the face of novel challenges." *Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (quoting *Brown v. Cameron-Brown Co.,* 92 F.R.D. 32, 49 (E.D. Va. 1981) and citing 3B Moore's Federal Practice P 23.45(4.–4) (2nd ed. 1980)). A lack of manageability justifies denial of

- 33 -

certification "only where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class." *Id.*

LaBrier suggests that for management purposes, liability and damages issues could be tried in a multi-phased proceeding, and the Special Master could aid in determining damages. State Farm argues that such management technique would violate its rights under the Seventh Amendment to have "juriable issues" determined by a single jury. Doc. 159, p. 29 (citing *Matter of Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir. 1995)). No motion to try this case in multiple phases is before the Court. In any event, mini-jury trials can certainly be held for purposes of trying jury issues.

## III.    Conclusion

Plaintiff LaBrier's motion for class certification, Doc.123, is granted and the class is defined as discussed above.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 25, 2016
Jefferson City, Missouri

- 34 -